IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WEATHERPROOFING TECHNOLOGIES, INC.,

                Plaintiff,                        OPINION & ORDER

    v.

                                                  13-cv-829-jdp

ALACRAN CONTRACTING, LLC,

                Defendant.

---

       This is a contract dispute arising from the construction of an army training facility in Fort McCoy, Wisconsin. Defendant Alacran Contracting, LLC, served as the general contractor, and the two primary subcontractors were plaintiff Weatherproofing Technologies, Inc. (WTI) and another company not a party to this suit. The contract price for WTI's share of the work was $3,341,000, out of the project total of $13,364,000. But the three contractors agreed orally that their payments would ultimately be reconciled so that they would share the profits or losses equally. Alacran paid eight WTI invoices totaling $704,698.37 in the course of construction. After Alacran refused to pay WTI's remaining invoices, WTI filed this suit to collect the rest of the $3,341,000. After a few adjustments to which WTI agreed, WTI now claims that it is owed $2,129,277.11.

       WTI has moved for summary judgment. Alacran opposes, contending that it has no obligation to pay WTI's invoices. Alacran contends that its only obligation to WTI is to share whatever profits or losses resulted from the project. According to Alacran, it received payments on the project of just under $13 million, but that its expenses were just over $13 million, producing a loss of $259,135.51. Alacran contends that because the project resulted in a loss, it does not owe WTI anything. The court will grant WTI's motion for summary judgment.

Alacran's accounting records are a mess, and the expenses reflected in those books are fraught with contradictions that its witnesses could not explain. In a previous order, the court precluded Alacran from introducing any of the underlying documentation of its expenses because Alacran had not produced that documentation to WTI. Dkt. 32. Alacran's expenses are therefore completely undocumented. No reasonable jury could base a verdict in this case on Alacran's contention that it suffered a loss of $259,135.51, because Alacran does not have admissible evidence to support that contention.

But Alacran has a more fundamental problem than sloppy accounting. Alacran's defense is that because the $13 million project produced a loss of about $250,000, it owes nothing to WTI, even though WTI did work with a contract value of $3.3 million dollars. Alacran might be on solid footing to ask WTI to absorb a share of the $250,000 loss, if Alacran could document that loss. But Alacran's theory that it owes nothing to WTI is frivolous. Accordingly, in addition to granting WTI's motion for summary judgment, the court will give Alacran 30 days to show cause why the court should not award WTI its reasonable attorney fees incurred in this case.

UNDISPUTED FACTS

Unless otherwise indicated, the following facts are material and undisputed.

Alacran and WTI are construction contractors who had worked together on government projects. In fall 2009, WTI and Alacran agreed to work together to respond to a request for proposals from the Army Corps of Engineers (ACOE) to build the Combined Arms Collective Training Facility in Fort McCoy, Wisconsin. Alacran and WTI executed a "Teaming Agreement," in which the companies agreed to cooperate to prepare a proposal to the ACOE and set out the parts of the project that they would each provide. Dkt. 36-1. Alacran would provide "project management, sitework, excavation, clear & grub, foundations, asphalt paving,

architectural, supervision and safety." WTI would provide "supervision oversight, roofing, building envelope, HVAC, electrical, and other disciplines in support of the project." *Id.* Alacran would submit the proposal to the ACOE as the primary contractor, and if the ACOE awarded the contract, WTI would be named as a subcontractor.

The ACOE awarded the contract to Alacran on March 9, 2010, in the amount of $13,381,800. As agreed, Alacran engaged WTI as a subcontractor. Alacran disclosed WTI as a subcontractor to the ACOE on a government form entitled "Statement and Acknowledgement." Dkt. 36-2. About the same time, Alacran engaged a second subcontractor, Stenstrom General Contractor/Design-Build Group, Inc. (Stenstrom) for other portions of the work. Alacran issued purchase orders to both subcontractors. WTI's purchase order was for $4,454,666.67. Dkt. 36-3. The WTI purchase order was signed personally by Alacran's president, and it stated that the amount was "contingent upon final buyout and management cost." *Id.* The three companies agreed orally to split the profits or losses from the project equally.

As the project progressed, the parties reduced the scope of WTI's responsibilities, eventually agreeing that WTI would do only the electrical and paving work. Over the course of the project, WTI submitted 12 invoices to Alacran totaling $3,341,000. The amount was below the $4,454,666.67 figure provided in the Purchase Order because of the narrowed scope of WTI's responsibilities. Alacran paid the first eight of WTI's invoices as they were submitted, totaling $704,698.37. Four of WTI's invoices, totaling $2,636,301.63, remain outstanding and unpaid.

The ACOE paid Alacran just under $13 million for the project. However, Alacran claims that its costs were above $13 million, and that it suffered a loss on the project of $259,135.51. It also contends that WTI's subcontractors caused delay and damages to the project. WTI has

agreed to deduct $507,024.52 for these costs, making the amount it seeks in its summary judgment motion $2,129,277.11.

## ANALYSIS

WTI has moved for summary judgment, contending that there are no factual disputes as to Alacran's breach of the contract and that it is entitled to $2,129,277.11 as a result of the breach. To prevail on its motion, WTI must show that it entered into a valid contract with Alacran, under which it was entitled to be paid a determinable amount, which in this case is reflected in WTI's invoices. WTI must also show that Alacran breached the contract.

Alacran contends that it never agreed to pay WTI's invoices and that none of the documents on which WTI relies are enforceable contracts that prove otherwise. Alacran maintains that because it suffered a loss, it need not pay WTI any more than it already has. Alacran further suggests that WTI incurred costs on the project that should be deducted from its share.

This court has jurisdiction on the basis of diversity of the parties and the amount in controversy. 28 U.S.C. § 1332. Because the court sits in diversity, it applies Wisconsin law.

A.  **Standard of review**

Summary judgment is appropriate if WTI can show "that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law" on the terms of the contract and Alacran's breach. Fed. R. Civ. P. 56(a). WTI bears the burden of proving the contract and its damages. *Household Utils., Inc. v. Andrews Co.*, 71 Wis. 2d 17, 236 N.W.2d 663, 669 (1976); *Schubert v. Midwest Broad. Co.*, 1 Wis. 2d 497, 502 N.W.2d 449, 452 (1957). The court considers the facts in the summary judgment record in the light most favorable to Alacran, the non-moving party, and draws all reasonable inferences in its favor. *Anderson v. Liberty Lobby,*

4

*Inc.*, 477 U.S. 242, 255 (1986). However, irrelevant factual disputes will not preclude the entry of summary judgment. *Id.* at 248. To survive summary judgment, Alacran must go beyond its pleadings and identify specific material facts showing genuine issues for trial "such that a reasonable jury could return a verdict" in its favor. *Id.*

**B. Breach of contract**

The parties did not execute a comprehensive contract detailing all elements of their agreement. But, as WTI contends, the essential terms of the parties' agreement are reflected in their oral agreement and three documents: the Teaming Agreement; the Statement and Acknowledgement; and the Purchase Order. These documents detail the parties' agreement to prepare their proposal for the bid, describe the initial scope of each company's responsibilities, and provide that WTI's compensation would be one third of the $13 million contract. Dkt. 36. Over the course of the project, the parties agreed to reduce the scope of WTI's work. The adjustment of WTI's responsibilities did not change the nature of the subcontracting relationship, but it did reduce WTI's share of the contract amount.

None of this is genuinely disputed. When the documents and the oral agreement are viewed together, particularly in light of the parties' conduct during the project, it is clear that the parties intended to work together to bid on the project and then execute it as contractor and subcontractor. This is shown both by the plain language of the agreements and by the context in which they were executed. *See Tufail v. Midwest Hospitality, LLC*, 2013 WI 62, ¶¶ 25-29, 348 Wis. 2d 631, 833 N.W.2d 586 (explaining the process of contract interpretation to determine the parties' intent). The parties won the ACOE contract and managed to successfully complete the project, notwithstanding any gaps or indefiniteness in the documents. *Dreazy v. N. Shore Pub. Co.*, 53 Wis. 2d 38, 191 N.W.2d 720, 723 (1971) ("Where it is apparent that the intent of

the parties was to enter into a contract, the contract should not fail for indefiniteness if the conduct of the parties will reasonably supply the omissions.") (internal citations omitted).

In its brief, Alacran now attempts to dispute even the subcontracting relationship. But this is not a genuine dispute. Alacran's owner and president, Dai Bui, repeatedly acknowledged that WTI was a subcontractor on the ACOE project. Dkt. 37 (Bui Dep. 97:12-98:5; 118:9-125:12; 165:3-177:20).

The documentation of the subcontracting arrangement does not specify how and when WTI was to be paid. According to WTI, it was to be paid for its work and materials by submitting invoices to Alacran as portions of the project were completed. WTI's view is confirmed both by the parties' conduct and Bui's deposition testimony. Alacran paid the first eight invoices, demonstrating its intent to include payment of invoices as a term of the contract. *See, e.g., Forest River, Inc. v. Long Vans, Inc.*, No. 13-cv-694, 2013 WL 6007397, at *3 (E.D. Wis. Nov. 13, 2013) (finding that by "failing to dispute the amount owed and making partial payments, [defendant] manifested its assent to . . . pay the amounts stated in the invoices"). Bui's deposition testimony describes how Alacran processed and paid its subcontractors generally (a "pay when paid" system based on receiving invoices from vendors) and specifically confirmed that Alacran used this invoicing process with WTI. Dkt. 37 (Bui Dep. 172:13-173:22).

Alacran contends that it never actually agreed to pay WTI's invoices. Alacran has a point, in the sense that Alacran did not agree to pay whatever amount WTI chose to invoice, even if those invoices exceeded what ACOE had agreed to pay for WTI's part of the project. Also as Alacran points out, the unpaid invoices do not appear to be part of the same routine process as the first eight. Three of the unpaid invoices were issued on the same day, each for approximately $500,000, an amount much greater than any of the first eight. The final invoice

6

was for nearly $1 million.[1] But despite the peculiarities of the four unpaid invoices, Alacran adduces no evidence whatsoever that these invoices do not reflect the ACOE contract amount for the work performed by WTI. The parties agree that the ACOE deemed the project complete and accepted the work in April 2012.

Alacran stopped paying WTI's invoices after November 2011, leaving approximately $2.6 million unpaid. Alacran offers two reasons why WTI has nevertheless been "paid in full," but neither is persuasive. First, Alacran alleges that there were deficiencies in the work of WTI and its subcontractors that resulted in fines and charges to the project. But these fines and charges were relatively minor, and WTI has agreed to deduct its share of those amounts from the amount due. Second, Alacran argues that the parties agreed only to split profits or losses, and because the project suffered a loss, Alacran owes nothing more to WTI. This argument is baseless for multiple reasons.

First, even if the court accepted Alacran's accounting evidence, Alacran's alleged loss is only $259,135.51, and WTI's one-third share would be $86,378.50. Based on the statement in the Purchase Order and the oral agreement, Alacran might have a legitimate claim that WTI should absorb its share of this loss (if Alacran could document the loss). However, according to Bui's testimony, project profits or losses were to be taken as an appropriate credit on *future* projects. Dkt. 37 (Bui Dep. 284-88). But even if WTI were compelled to absorb the loss on *this* project, the $86,378.50 loss would not come close to resulting in WTI being "paid in full."

---

[1] Alacran contends that WTI's invoices are too irregular to be considered admissible business records. Dkt. 39, at 9. WTI blames the irregularity on Alacran's delay in pre-approving the invoices. In any case, the frequency with which WTI issued its invoices is not related to the amount owed according to the invoices. Alacran's attempt to undermine the reliability of WTI's invoices fails. *Fleming Cos., Inc. v. Krist Oil Co.*, 324 F. Supp. 2d 933, 942 (W.D. Wis. 2004) (concluding that the "existence of some errors, apparently unrelated to the issue of the amount defendant owes plaintiff" does not render the invoices inadmissible for lack of reliability).

Second, as indicated above, Alacran has no admissible evidence to show a loss on the project. Because Alacran disposed of any underlying documentation of its expenses, the court precluded Alacran from introducing any such documentation. This leaves Alacran with only its QuickBooks accounting records as evidence of its losses. But Alacran has no witness with personal knowledge to establish that the QuickBooks records accurately reflect the expenses of the project. Bui admitted that he did not know how QuickBooks records worked. Dkt. 37 (Bui Dep. 186:16-190:23, 213:12-22). Alacran's bookkeeping consultant started after the project was complete. Dkt. 37 (Bui Dep. 126:12-23). Alacran's QuickBooks records are filled with contradictions, which Alacran has no admissible testimony to explain.

Alacran would like to shift the burden on this point to WTI. Alacran argues that WTI has the burden to show both Alacran's breach of their agreement, and also the amount of WTI's damages. Because the parties agreed to share profits and losses, Alacran argues that it is WTI's burden to show that Alacran did not suffer a loss. This is another baseless argument. Alacran, as the general contractor on a project that would share profits and losses, should have assiduously tracked its expenses. The lack of evidence of Alacran's expenses is a problem of its own making, which it cannot blame on WTI. *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1365 (7th Cir. 1996) (citing Charles T. McCormick, McCormick Handbook on Damages § 27 at 101 to state that "[w]here the defendant's wrong has caused the difficulty of proof of damages, he cannot complain of the resulting uncertainty").

An unjustified nonpayment of a material amount due constitutes breach. 5 Bruner & O'Connor Construction Law § 18:26 ("No other contract breach is more material to contractors (and their subcontractors and suppliers) than unjustified nonpayment of material amounts."). Alacran failed to pay the last four invoices, totaling $2,636,301.63. It offers no justification for

its nonpayment. Alacran breached the contract and it is liable to WTI for the amount of the outstanding invoices, less the adjustments conceded by WTI.[2]

**C. Damages**

WTI is entitled to payment for the work it performed as the parties agreed in the contract. Under Wisconsin law, WTI must prove the amount of its damages with reasonable certainty. *Ma v. Cmty. Bank*, 686 F.2d 459, 466 (7th Cir. 1982). WTI submitted 12 invoices for its work, totaling $3,341,000. It has been paid $704,698.37, based on its invoices. That leaves $2,636,301.63 invoiced and unpaid. After agreeing to reduce the amount for its regulatory violations ($385,487.86) and its share of the liquidated damages ($121,536.66), WTI seeks $2,129,277.11. Because Alacran has not adduced evidence to create a genuine dispute as to the amount due, the court concludes that WTI has proven its damages with reasonable certainty and will award it $2,129,277.11.

## CONCLUSION

Alacran's discovery conduct and the positions it has taken in this case have been questionable. Based on the record before the court, it appears that Alacran has unnecessarily burdened WTI with the expense of protracted litigation, when it should have conceded its liability. Accordingly, the court will order that Alacran show cause why it should not pay WTI's reasonable attorney fees and expenses for this case.

---

[2] WTI also pleaded recover under theories of unjust enrichment and quantum meruit, which neither party addressed in their brief. Because the undisputed facts demonstrate the existence of a contract between the parties, the court need not consider WTI's constructive or implied contract theories.

ORDER

IT IS ORDERED that:

1. Plaintiff Weatherproofing Technologies, Inc.'s motion for summary judgment, Dkt. 33, is GRANTED.

2. Plaintiff is AWARDED damages in the amount of $2,129,277.11.

3. Defendant Alacran Contracting, LLC, may have until March 6, 2015, to show cause why the court should not award plaintiff its reasonable attorney fees incurred in this case as a sanction for defendant's frivolous arguments. If, by that date, defendant fails to submit a response as directed, the court will determine and award plaintiff's reasonable attorney fees and expenses.

Entered February 6, 2015.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge